IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2005

# IN THE MATTER OF K. C., JR.

**Appeal from the Juvenile Court for Davidson County**
**No. 21969     Betty K. Adams Green, Judge**

---

**No. M2005-00633-COA-R3-PT - Filed October 4, 2005**

---

This case involves a boy whose mother placed him in the care and custody of an aunt when he was two months old because she could not take care of him. The aunt furnished all the child's needs and raised him as if he were her own. After he reached the age of ten, the mother filed a petition to have custody of the child restored to her. The aunt subsequently filed a petition to terminate the mother's parental rights on the grounds of abandonment and persistence of conditions. After a hearing, the trial court denied the mother's petition for custody and terminated her parental rights. We affirm the denial of the petition for custody, but we reverse the termination of parental rights because the grounds were not proved by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

J. Stephen Mills, Nashville, Tennessee, for the appellant, S. B.

Kelli Barr Summers, Brentwood, Tennessee, for the appellees, A. C. and J. C.

## OPINION

### I. FACTS

The child at the center of this case was born out of wedlock on January 18, 1994. The child's father was named K.C., and the child became K.C., Jr. (hereinafter "K.C.Jr."). The mother, S.B. (hereinafter "Mother"), already had another child by a different father who was eleven months older than K.C.Jr. At the time of K.C.Jr.'s birth, Mother was unemployed and did not have a residence of her own, but moved back and forth between her own mother's home and her grandmother's home.

K.C.Jr. was a colicky baby, and, under all her circumstances, Mother found herself unable to take care of him. She considered putting him up for adoption. Instead, her aunt, A.B.C. (hereinafter "Aunt") offered to take the infant and care for him. The proof shows that Aunt raised K.C.Jr. from about the age of two months to the time of trial, when he was ten years old.

Aunt had to take K.C.Jr. to Vanderbilt Medical Center frequently for well-baby treatments and for illnesses. The people at Vanderbilt told Aunt that she needed to become his legal guardian in order to be able to consent to medical treatment. She accordingly filed a petition for legal custody in the Davidson County Juvenile Court. On December 29, 1994 the Juvenile Court Referee granted Aunt temporary custody of K.C.Jr., noting that all the parties were in agreement with that arrangement. The order also stated, "the parents are not financially or emotionally able to care for the minor child." The referee struck through the lines on the printed decree form relating to visitation and support.

In 1998, Mother filed a petition to regain custody of K.C.Jr. A hearing on the petition was conducted before the Juvenile Court's Senior Referee. Those present at the hearing were Aunt, K.C.Jr., the child's guardian ad litem, K.C. (the father), and a caseworker from the Department of Children's Services. Mother failed to appear.[1]

On the motion of the guardian ad litem, the court dismissed the petition without prejudice. The court's order also set out an every other weekend visitation schedule, with Mother to provide transportation, and ordered Mother and the father to each pay child support of $40 per week. The Certificate of Service indicates that Mother and the father were both served by mail with the court's order.

After Aunt talked to Mother about potentially adopting K.C.Jr., Mother filed her second Petition for Custody of K.C.Jr. on May 25, 2004. This was followed by a Petition to Terminate Mother's parental rights, which was filed by Aunt and her husband J.C. on June 9, 2004. K.C., the child's father, subsequently joined in the petition of Aunt and her husband, consenting to the termination of his own parental rights, urging the court to terminate Mother's rights, and stating in an attached affidavit that he believed it was in the child's best interest that K.C.Jr. remain with Aunt and her husband.

## II. COURT PROCEEDINGS

A hearing on both petitions was conducted on November 16, 2004. Both parties were represented by counsel. A guardian ad litem had been appointed to represent the interests of the

---

[1]Mother testified that when she filed the petition she had a place to live, but her mother subsequently moved in with her, and a worker from the Department of Children's Services had visited the home and observed that there was no place for K.C.Jr. to sleep. She also testified that Aunt had persuaded her that it would be better for K.C.Jr. to stay where he was.

child. Aunt and Mother both testified at length. Aunt's husband also testified, as did two other witnesses. The father did not appear.

The testimony as a whole showed that K.C.Jr. was a very bright child who had largely thrived in the custody of Aunt. He attended a magnet school and participated in extra-curricular activities that included training in performance dance and singing in the choir at his church. Aunt was very supportive of all his activities, as was her husband J.C. They had married two years earlier.[2] Both were eager to see the child develop his abilities to the greatest extent possible. J.C. said that K.C.Jr. "has challenged me how to motivate him to be all that he can be."

As for the biological parents, K.C. gave his son clothes, money and toys from time to time and paid for his swimming lessons when the child was three or four. Mother bought him Christmas presents and customarily hosted a birthday party to celebrate both her sons' birthdays together. K.C.Jr. visited with her almost every other weekend, and she provided his needs during those visits.

K.C.Jr. had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) for which he took medication. The evidence showed that he was keenly aware of the uncertainty of his status as to a permanent arrangement with his Aunt and was anxious that it be made permanent.

Sharon Jacobs, a school counselor who had worked with K.C.Jr. for four years testified that he was capable of doing good academic work, but that he often he seemed angry or upset and that she counseled him at such times. She observed that his emotional upheavals seemed to occur most often on Mondays after he had spent the weekend visiting his mother. She also testified that Aunt was extremely responsive to her concerns and frequently came in for conferences, but that Mother had never contacted her for any reason.[3]

Deena Jefferson, a child care provider, testified that she took care of K.C.Jr. when he was still a baby. She stated that Mother had never contacted her during that period to see how the child was doing. She also testified that she had remained in touch with K.C.Jr. since that time, and that he called Aunt "mommy."

Aunt testified that she loved K.C.Jr., that she had always treated him as if he were her own child, and that she and her husband wished to adopt him. She further testified that the child had frequently stated that he wished she was his mother, and that when he learned of his mother's first petition for custody he had been very anxious and cried constantly, because he did not want to live with her.

---

[2] J.C. testified that he had two adult sons and that Aunt also had two adult children of her own. The couple had also adopted another boy and had two foster children in their home.

[3] Mother admitted that she had never gone to K.C.Jr.'s school. Asked why not, she said "Cause I have to get permission from [Aunt] to even pick him up. I'm not on the pickup list or anything as far as that's concerned . . . cause they know her as his mother, not me. So, I have to get permission."

Aunt also testified that she had always made K.C.Jr. available to his mother and would continue to do so even if Mother's rights were terminated.[4] She stated that Mother almost never called her, but that K.C.Jr.'s older half-brother frequently called on the weekends and asked K.C.Jr. to come visit. On such occasions, Aunt would drive the child to Mother's apartment, and she would pick him up when he was ready to return. She always drove him to and from school on weekdays and also to dance rehearsals at the Boys and Girls Club, bowling, church-related events, and other activities.

Mother testified that when she gave up K.C.Jr., she intended him to stay with Aunt only until she was able to get her life together and that she had had no idea it would take so long. She stated that she had married a year or two prior to the hearing[5] to a man who had a part-time job with FedEx. She testified that she herself had been employed part-time at a Family Dollar Store during the previous four weeks. She was working about 22 hours a week, and was earning $6.75 per hour. Mother had previously worked for six months at a Dollar General Store, but "changed jobs" because she didn't get along with the manager.

Mother also testified that she, her husband, and her older child were living together in an apartment totally paid for by Section Eight funding. Under questioning, she admitted to a number of changes of residence after Aunt took K.C.Jr. She lived with an aunt in Florida for over a year, stayed in Chicago for three or four months, stayed with other relatives in Nashville, even lived with Aunt on two different occasions.[6] She indicated, however, that she intended to remain in her current home and that because of her job and her husband's job, she was now in a position to feed and clothe K.C.Jr. "just like my other son." However, she testified that she had no idea how much money her husband earned, how much the couple earned together, or what their income had been the previous year.

Mother admitted that she had not paid support for K.C.Jr. at any time prior to the hearing, but testified that Aunt had never asked her for any money and, in fact, had told her she did not have to pay her anything. She denied knowing anything about the child support order arising from the 1998 hearing.

At the conclusion of the proof, the court dismissed Mother's Petition for Custody, stating that, ". . . quite frankly, the proof in this matter has been so convoluted that it's almost impossible to determine what the circumstances actually are today to determine whether there has been a material change in circumstance. I don't think that burden has been met."

---

[4] Mother also testified that if she were granted custody, she would not limit contact between K.C.Jr. and Aunt.

[5] At one point, she testified that she had been married two years. At another point she said it had been one year.

[6] Mother admitted to having used an entirely different last name for a while (including on a motion in Juvenile Court) which was neither her married nor her maiden name. She claimed, somewhat improbably, that her use of the name was not intentional, but was due to a mistake at the "drivers license place."

The court then invited the attorneys to present arguments on Aunt's Petition for Termination. At the conclusion of argument, the trial court took the matter under advisement. On December 15, 2004, the trial court entered a detailed order with findings of fact and conclusions of law. The court found that Mother was able-bodied but had not contributed to the support of K.C.Jr., that she had only kept jobs for brief periods of time, and "that it does not appear likely that she will be able to maintain a stable home or a stable job." The court also mentioned concerns about Mother's credibility and contradictions in her testimony.

The court cited the statutes setting out the grounds for termination and held that there was clear and convincing evidence that Mother had abandoned her child in accordance with the definition set out in Tenn. Code Ann. § 36-1-102(1)(A)(i), that there was clear and convincing evidence of the separate ground of persistence of conditions, as set out in Tenn. Code Ann. § 36-1-113(g)(3)(A), and that there was clear and convincing evidence that it was in the best interest of the child that Mother's parental rights be terminated, in accordance with the factors set out in Tenn. Code Ann. § 36-1-113(i). This appeal followed.

### III. THE PETITION FOR CUSTODY

Mother argues on appeal that the trial court erred in failing to grant her custody of K.C.Jr., and she invokes the judicially-recognized constitutional right, under both the United States and Tennessee Constitutions, that parents have to the care, custody and control of their own children. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994). She seeks to obtain the benefit of a rule that is a corollary to that right: in custody disputes between a parent and a non-parent, the parent's right to custody is generally deemed superior to that of the non-parent. *Blair v. Badenhope*, 77 S.W.3d 137, 142-43 (Tenn. 2002); *Hawk v. Hawk,* 855 S.W.2d 573 (Tenn. 1993); *Doles v. Doles*, 848 S.W.2d 656, 66-661 (Tenn. Ct. App. 1992)(citing cases from many jurisdictions).

A biological parent is, in many circumstances, entitled to a presumption of "superior parental rights" in the custody of his or her children. *Blair*, 77 S.W.3d at 141, citing *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999). Under this presumption, a biological parent is entitled to custody of his or her child unless the child's welfare is threatened by a danger of substantial harm. *Blair*, 77 S.W.3d at 142-43.

However, while the rule of superior parental rights applies in an initial determination of custody as between a biological parent and a non-parent, it does not apply where a biological parent seeks to modify an existing valid custody order placing custody with a non-parent. *Id.* at 146.

> . . . a natural parent enjoys the presumption of superior rights in four circumstances: (1) when no order exists that transfers custody from the natural parent; (2) when the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent; (3) when the order transferring custody from the natural parent

is invalid on its face; and (4) when the natural parent cedes only temporary and informal custody to the non-parents.

*Id.* at 142.[7]

As to the effect of a valid order transferring custody from a parent to a non-parent, the Court held that no constitutional principle requires that the parent be again afforded a presumption of superior rights in a modification proceeding. *Id*. at 146. Similarly, a parent who has voluntarily consented to transfer of custody to a non-parent cannot later claim superior parental rights in a modification proceeding, even if no court has previously found the parent to be unfit. *Id*. at 147-48. Therefore, the appropriate test is not whether return to the parent would result in substantial harm to the child. To hold otherwise would render a valid custody order ineffectual and would jeopardize the child's interest in stability in placement. *Id.* at 149-50.

Consequently, a biological parent seeking to modify a custody order that grants custody to a non-parent must show that a material change in circumstances has occurred that makes a change in custody in the child's best interests. *Id.* at 148. This is the same standard applied in parent-vs-parent modification proceedings, *Id.*[8] In determining whether such a change of circumstances has occurred, the court should consider several factors.

Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether the change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Blair*, 77 S.W.3d at 150.

The party petitioning to change the prior custody order must prove both that a material change of circumstances has occurred and that a change of custody is in the child's best interest. *Kendrick*, 90 S.W.3d at 575. Such determinations involve a two-step analysis. *Cranston*, 106 S.W.3d at 644; *Kendrick*, 90 S.W.3d at 570. Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick*, 90 S.W.3d at 569; *Blair* 77 S.W.3d at150.

---

[7]Mother relies on this or similar language in *Blair* to argue she still should be afforded the presumption of superior parental rights to custody because the order only granted temporary custody and that she did not knowingly consent to a permanent transfer of custody. We find these arguments unavailing. First the court making the original grant of custody to Aunt found the parents were not capable of providing care. Second, the child remained in the custody and under the care of Aunt for ten years, with Mother's knowledge and apparent consent.

[8]Thus, decisions from such cases provide relevant authority.

We conclude that the trial court applied the correct standard in holding that Mother was required to prove a material change of circumstances and also that a change of custody was in the child's best interest. We also conclude that the evidence does not preponderate against the trial court's finding that Mother did not meet this burden. *See Blair*, 77 S.W.3d at 151 (applying the standard of review in Tenn. R. App. P. 13(d)).

The *Blair* case is once again instructive. In that case, Mr. Blair, the biological father, had voluntarily relinquished legal custody of a baby girl to the maternal grandmother after the untimely death of the child's mother. Some years later, the father married, moved his residence to be closer to his daughter, and filed a petition for custody. Mr. Blair had made great efforts to establish and nurture a relationship with his daughter. Nonetheless, the Supreme Court held that he had failed to show the existence of a material change of circumstances warranting a change of the child's custody. 77 S.W.3d at 151.

The Court found that neither a closer bond between the parent and child nor the improvement in the parent's residence constituted a material change in circumstances. *Id.* Further, the child had thrived in the caring and stable environment provided by her grandmother, excelling academically and participating in a number of activities. Consequently, the Court held, the interest in maintaining the stable and successful relationship and custodial arrangement with the grandmother weighed against a change of custody. *Id.* at 151.

In the case before us, Mother's testimony indicated that she had improved her circumstances somewhat and obtained some stability: she had married, acquired her own apartment, and gotten a part-time job. However, there was no evidence that Mother had ever shown any interest in her son's education, in the activities he participated in, or in the fullest development of his abilities.

In contrast, Aunt has maintained stable employment and housing for many years and has always furnished K.C.Jr.'s physical needs. She has also demonstrated a consistent concern for his emotional and educational development. She has helped him with his schoolwork, conferred with teachers and counselors, and supported his interests in a variety of extra-curricular activities. Her husband, J.C., reinforced her efforts. K.C.Jr. has flourished in this environment and has expressed a strong desire to remain with Aunt.

Mother failed to prove a material change of circumstances affecting the welfare of the child in a meaningful way that would justify removing K.C.Jr. from the loving and stable environment he has known. Even if a material change of circumstances had been proved, it is clear from the proof discussed herein that K.C.Jr.'s best interest would not be served by removing him from the stable home that he has known his whole life where he has thrived. We affirm the trial court's dismissal of Mother's Petition for Custody.

## IV. TERMINATION OF PARENTAL RIGHTS

Parents have a fundamental right to the care, custody and control of their children that is protected by both the United States and Tennessee Constitutions. *Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. at 1212-13; *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *Nale v. Robertson*, 871 S.W.2d at 678. However, that right is not absolute and may be relinquished or terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75; *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l*)(1). A parent whose rights are terminated has "no right thereafter to have any relationship, legal or otherwise, with the child." *Id.* Rights of fundamental importance are at stake in termination proceedings, and "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996), quoting *Santosky*, 455 U.S. at 787.

A parent's rights may be terminated where the state's interest in the welfare of a child justifies interference with a parent's constitutional rights. The legislature has defined those situations and, in Tennessee, termination of parental rights is purely statutory. *See* Tenn. Code Ann. § 36-1-113(g) (listing grounds). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004).

Under those statutes, a court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Both factors are required.

Thus, the first requirement for termination of parental rights is that a statutorily defined ground be shown to exist by the requisite standard of proof. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). If a ground is proved, the trial court must then make a determination of whether termination of the parent's rights is in the child's best interest. However, if no ground is proved by the requisite evidentiary standard, a best interest analysis is unwarranted.

The higher standard of proof, clear and convincing evidence, is one of the safeguards necessitated by the severity of the interference with a parent's fundamental right. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622. In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to

be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *In re C. W. W.*, 37 S.W.3d at 474. In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re C. W. W.*, 37 S.W.3d at 474; *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001). The party seeking to terminate a parent's rights has the burden to prove his or her case by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 546.

In addition, due to the grave consequences that accompany such decisions, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Because of the constitutional implications, gravity of consequences, higher standard of proof, and required individualized decision making, our legislature has explicitly required that courts making termination of parental rights decisions "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k).

In the case before us, the trial court found that the grounds of abandonment and persistence of conditions had been proved by clear and convincing evidence and, also applying the clear and convincing evidence standard, that it was in K.C.Jr.'s best interest that Mother's parental rights be terminated.

## V. ABANDONMENT

Abandonment is one of the statutory grounds for termination of parental rights, Tenn. Code Ann. § 36-1-113(g)(1). It has several definitions, but the one at issue herein is found in Tenn. Code Ann. § 36-1-102(1)(A)(i). Under that definition, the ground of abandonment exists where a parent has willfully failed to visit or willfully failed to support, or to make reasonable payments toward support, of the parent's minor child for a period of four consecutive months immediately preceding the filing of a pleading to terminate the parent's rights to that child.

Willful failure to visit includes willful failure to engage in more than token visitation, Tenn. Code Ann. § 36-1-102(1)(E), and "token visitation" means

> that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child.

Tenn. Code Ann. § 36-1-102(1)(C).

Similarly, willful failure to support and willful failure to make reasonable payments toward support includes the willful failure to provide more than token payments toward the support of the child, Tenn. Code Ann. § 36-1-102(1)(D), and "'token support' means that "the support, under the

circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

As the language of the statute makes clear, willfulness is a critical element of this definition of abandonment. Not only is it a statutory requirement, it is constitutionally required as well. *In re Swanson,* 2 S.W.3d at 188. The failure to support or visit must be intentional, or it cannot constitute a ground for termination of the constitutionally-protected right to the care and custody of one's own child. *In the Matter of D.L.B.,* 118 S.W.3d at 367.

The concept of willfulness, or intent, is at the core of the definition of abandonment and is often the determining factor in whether a petitioner has shown the existence of that ground by clear and convincing evidence. *See, e.g.*, *In re L.J.C., A.L.C., and J.R.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003) (holding that the record did not provide clear and convincing evidence that an indigent mother intended, rather than was simply unable, to pay child support); *In re A.D.A.*, 84 S.W.3d 592 (Tenn. Ct. App. 2002) (holding that the proof did not show that the mother's failure to visit was intentional rather than the result of a number of circumstances including DCS's placement of the child in another county).

The question of intent or willfulness is fact specific and depends on the totality of circumstances. *In re D.L.B.*, 118 S.W.3d at 367. In general terms, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (no Tenn. R. App. P. 11 application filed).

Under the ground at issue, a parent must have willfully failed to support or visit for four consecutive months immediately preceding the filing a the petition to terminate. For the purposes of this appeal, therefore, the relevant period runs from February 9 to June 9, 2004.

### A. Willful Failure to Visit

The trial court found that Mother abandoned K.C.Jr. by willfully failing to visit or engage in more that token visitation with him. Neither Aunt nor the Guardian ad Litem has argued in support of this finding.

The proof shows more than token visitation during the relevant period. Aunt herself admitted that in the spring prior to the filing of the termination petition, K.C.Jr. visited at his mother's home one or two weekends a month, often from Friday to Sunday. Others confirmed that the child regularly spent time on weekends with Mother.

Consequently, we conclude that Aunt failed to prove by clear and convincing evidence that Mother willfully failed to visit with K.C.Jr., and we must, therefore, reverse the trial court's determination on this ground.

## B. Willful Failure to Support

It is undisputed that Mother did not pay any direct financial support to Aunt for K.C.Jr., including during the four months immediately preceding the filing of the petition. Mother asserts she supported K.C.Jr. during his visits with her and gave him presents.

Simply proving failure to pay support is not in and of itself sufficient to prove that the failure was willful or intentional. The trier-of-fact is obligated to engage in "the type of individualized decision-making which must take place when a fundamental right is at stake." *State v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004). The definition of token support itself requires consideration of the circumstances of the individual case. Tenn. Code Ann. § 36-1-102(1)(B).

Several cases of this court have set out the major considerations to take into account when determining whether or not a failure to support should be considered willful for purposes of terminating a parent's rights.

> Terminating parental rights based on failure to support presupposes (1) that the parent is aware of his or her duty to support, (2) that the parent is able to provide financial support, either through income from private employment or qualification for government benefits, and (3) that the parent has voluntarily and intentionally chosen not to provide financial support without a justifiable excuse.

*In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004).

With regard to the first element, Aunt points to the 1998 order requiring Mother to pay weekly child support in the amount of $40[9] directly to Aunt. Mother argues that Aunt never asked her to contribute to the support of K.C.Jr. and claims that she never received the 1998 court order and thus was unaware of any specific legal obligation.[10] Aunt also notes that Mother testified that she had sought child support from the father of her older son, and argues that Mother was therefore aware in a general way that a parent has a legal duty to support his or her child.[11]

As to the second element, Mother's ability to pay support, "a parent's failure to support a child will not amount to abandonment when the parent is financially unable to render financial support." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995). Aunt argues that Mother's

---

[9] There is nothing in the record before us to indicate how the court arrived at that amount, which should have been based on Mother's income, in view of the fact Mother agreed to dismiss her petition for custody and did not appear at the hearing.

[10] She also argues that since she agreed at that time with Aunt that K.C.Jr. should remain it Aunt's custody and did not pursue her petition, she had no notice the court would set a support obligation.

[11] Our courts have stated many times that an obligation to pay support for one's child exists even in the absence of a court order to do so. *State v. Wilson,* 132 S.W.3d 340, 343 (Tenn. 2004); *State v. Culbertson*, 152 S.W.3d at 523.

testimony established that she had worked at least part time and, therefore, Mother had the ability to pay support, especially since her expenses appeared to be minimal in view of the financial assistance she received in subsidized housing and other benefits.[12]

The trial court found that Mother had willfully failed to support or make reasonable payments toward support of K.C.Jr. during the relevant time period, based upon its findings that Mother was able bodied and able to work, that she has worked at a variety of jobs and was currently, by her own testimony, bringing home about $300 biweekly. The court also reasoned that since Mother had another child a year older that K.C.Jr., she knew what it costs to raise a child. The court made no finding regarding Mother's notice of the 1998 support order. The court's finding of willful failure to support was not based on her failure to pay the amount under that order.

The proof regarding Mother's ability to pay is less than clear. While Mother asserted she had the present capability to provide for K.C.Jr. if she were awarded custody, Aunt argues that Mother's financial condition remains unstable. The proof does not establish what amount of support to Aunt would be reasonable in light of all the circumstances, including Mother's income and expenses and her support of K.C.Jr. when he visits.

There is another factor that we think must be considered in determining whether failure to pay direct financial support to Aunt in the circumstances of this case should constitute a ground for termination. Courts cannot terminate the rights of a parent of a child in foster care on the ground of abandonment unless the record establishes that the Department of Children's Services and/or the trial court have given specific notice to the parent (1) of the definition of abandonment (2) that the willful failure to support or to visit for four months can be used to terminate the parent's rights. Tenn. Code Ann. § 37-2-403(a)(2); *In the Matter of J. L. E.*, No. M2004-02133-COA-R3-PT, 2004 WL 1541862 (Tenn. Ct. of App., June 30, 2005) (no Tenn. R. App. P. 11 application filed). These provisions are designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct.

Because the Department is not involved in this case and K.C.Jr. is not in foster care, the notice provisions cited above do not directly apply herein. Nonetheless, the legislature's concern with the fairness of using abandonment as a ground without notice that provides an opportunity to avoid the conduct establishing that ground does have some application. The gravity of the loss of constitutionally protected parental rights implicates concepts of fairness. Individualized decision making requires looking at all the circumstances.

Aunt was apparently aware of the 1998 order establishing support, but she did not testify that she ever informed Mother of the order or inquired if she received it. The support was to be paid directly to Aunt, but she never sought court enforcement of the order and never told Mother she expected support. Separate and apart from the 1998 order, Aunt never asked Mother for any financial

---

[12]Aunt also argues, as to the persistence of conditions ground discussed later herein, that these same facts show that Mother continues to be financially unstable.

support, and Mother testified Aunt told her she did not have to pay her anything. Aunt did not dispute this testimony.

There is no indication that support from Mother was necessary to provide for K.C.Jr.'s needs. To the contrary, Aunt never pursued support, and K.C.Jr. was well taken care of. These statements should not be taken to imply that Mother has no obligation to provide support. They simply indicate that Mother was aware that her child's daily needs were being met by Aunt. Coupled with Aunt's statements that Mother need not pay her anything, it is understandable that Mother did not think that such support was needed. She was certainly never informed that the failure to pay support put her parental rights at risk.

In sum, it appears to us that when measured against the requirement of clear and convincing evidence, the proof was insufficient in this case to establish that Mother's failure to pay Aunt for the support of K.C.Jr. was willful. We must, therefore, reverse the trial court's finding that Mother abandoned her child by willfully failing to support him.

## VI. PERSISTENCE OF CONDITIONS

The trial court found an additional ground for termination of Mother's parental rights in Tenn. Code Ann. § 36-1-113(g)(3), commonly referred to as "persistence of conditions." That ground applies when the child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Mother argues that the legislature intended Tenn. Code Ann. § 36-1-113(g)(3) to apply only to situations where the Department of Children's Services has removed children from the home of the biological parent, but not to situations where the parent has voluntarily transferred custody to a relative. This court has applied this ground where the original removal was not initiated by DCS, without discussion of the issue of its applicability in that situation. *See V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323 (Tenn. Ct. App. July 26, 2004) (no Tenn. R. App. P. 11 application filed).

-13-

More recently, we have considered in depth an argument similar to Mother's. In *In re Audrey S. and Victoria L.*, No. M2004-02758-COA-R3-PT, 2005 WL 2051286 (Tenn. Ct. App. Aug. 25, 2005), the parent argued that if the initial removal of the child arose in the context of a custody dispute, the persistence of conditions ground did not apply. We declined to approve such a blanket exception, but held that the persistence of conditions ground in Tenn. Code Ann. § 36-1-113(g)(3) was applicable only to cases in which the prior order granting custody to the non-parent (or removing the child from the parent's home) was based on a judicial finding of dependency, neglect, or abuse.[13] *Id*. at *23. Such a finding may be explicit or may be implied from the context and language of the order. *Id.* at *24.

In the case before us, Aunt obtained custody of K.C.Jr. pursuant to an order of the juvenile court that stated (1) a dependency and neglect petition had been filed; (2) Aunt was granted custody of K.C.Jr. based upon an agreement between the parties; and (3) "That the parents are not financially or emotionally able to care for the minor child." Although the order does not contain a specific finding that the child was dependent and neglected, it arose from a dependency and neglect proceeding. Further, the court's finding that the parents were not able to care for the child is sufficient to support a finding of dependency and neglect, *see* Tenn. Code Ann. § 37-1-102(b)(12), and therefore constitutes an implicit finding that K.C.Jr. was dependent and neglected. Accordingly, the persistence of conditions ground can be applied in this case.

Under the clear language of the statute, the conditions which make it reasonably likely the child will be subjected to further neglect and, therefore, prevent the child's safe return to the home may be either (1) the conditions that led to the initial removal or (2) other conditions likely to cause further neglect. Herein, the trial court found, "It does not appear to the Court that she will be able to maintain a stable home or stable job. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to Mother in the near future."[14]

We cannot conclude that there was clear and convincing evidence, making it highly probable, that conditions persisted in Mother's home or in her situation that prevented a safe return of child to her custody. There was no proof that conditions were such that returning the child to Mother's home would in reasonable probability lead to neglect or abuse. There was simply no proof Mother was unable to adequately parent K.C.Jr.

---

[13]The statute's use of the word "further" when describing the potential for future abuse or neglect was significant to this conclusion as well as the history of the ground now set out in Tenn. Code Ann. § 36-1-113(g)(3).

[14]While the trial court was making the findings required by the statute, we note that in this case the child cannot or will not be returned to Mother's custody unless or until Mother can show there has been a material change of circumstances affecting the child's well-being that makes return to her custody in the child's best interest. *See* Section III of this opinion. Under *Blair*, such a change would probably have to be based on a deterioration of K.C.Jr.'s situation in his Aunt's home, regardless of demonstrated stability or economic improvement by Mother. In other words, even if Mother had remedied the conditions to the court's satisfaction, that would still not be enough to justify a change of custody. Thus, it is not necessarily the current conditions in Mother's home that prevent the safe return of K.C., Jr. Instead, it is the legal status conferred by the order transferring custody and the attendant requirements for changing that custody.

The evidence showed that Mother is now married, is employed, and has a place of her own to live. She has enjoyed stability in her situation for some time. She has raised her other son, and there was no evidence she was an inadequate parent for that child. Some of the circumstances leading to her emotional inability to parent K.C.Jr. as an infant no longer exist.

Aunt's primary argument is that Mother has not improved her financial situation sufficiently and lacks financial stability. She argues that Mother's reliance on government benefits while she and her husband work part time shows Mother continues to struggle financially and is not financially stable. We cannot hold that a parent's eligibility for and receipt of government benefits creates the reasonable probability a child in the parent's home will be neglected. There is no other proof that it would not be safe for a child to be placed in Mother's home.

We conclude Aunt failed to establish by clear and convincing evidence the ground of persistence of conditions as defined in Tenn. Code Ann. § 36-1-113(g)(3).

## VII. Conclusion

Our reversal of the trial court's termination of Mother's parental rights does not affect K.C.Jr.'s custody. The prior order granting custody to Aunt remains in effect and can only be modified in accordance with the legal requirements set out earlier. Questions of visitation and support remain within the purview of the trial court, subject to review upon motion by a party.

Consequently, K.C.Jr. can continue to enjoy the loving, supportive, and stable environment which has enabled him to develop his talents and abilities. His aunt and her husband have been shown to be caring and exceptionally competent caretakers who have provided K.C.Jr. with love and a good home. Nothing in this opinion alters or detracts from that reality.

Because the existence of grounds for termination of Mother's parental rights was not proved to the constitutionally-required standard of proof, we have not discussed the child's best interest as to termination. However, as we noted regarding Mother's petition for change of custody, it remains in K.C.Jr.'s best interest to stay in the home he has enjoyed for his entire life.

The trial court's denial of Mother's petition for custody is affirmed. The court's termination of her parental rights is reversed. We remand this case to the Juvenile Court of Davidson County for any further proceedings necessary. Divide the costs on appeal equally between the appellant and the appellees.

_____
PATRICIA J. COTTRELL, JUDGE

-15-